**FIDELITY FUNDING OF CALIFORNIA, INC. and Fidelity Funding Financial Group, Inc., Plaintiff,**

**v.**

**Isaac REINHOLD, et. al., Defendants.**

**No. 95–CV–3130(ARR)CLP.**

United States District Court, E.D. New York.

Oct. 22, 1997.

Jack G. Stern, Wendy Z. Brenner, Barrett & Gravante LLP, New York City, for UTA, Masel, Mendlovic and Welz.

Michael A. Lynn, New York City, for Fidelity.

Gerald Shargel, Jay Goldberg, Gustave H. Newman, Newman & Schwartz, Andrew Miltenberg, Nesenoff & Miltenberg, Philip L. Guarino, Ross & Hardies, Ben Brafman, Brafman, Gilbert & Ross, Roy I. Martin, Bizar & Martin, LLP, David Field, Field, Lomenzo & Turret, P.C., Marvin Segal, Srocco & DeMaio, P.C., New York City, Steven Legum, Carlucci & Legum, Mineola, NY, Wiiliam C. House, New York City, Abraham B. Kreiger, Great Neck, NY, Daniel Galinson, Kaplowitz & Galinson, Garden City, NY, Samuel J. Reich, Reich, Werner & Alexander, Pittsburgh, PA, Jack Segal, Rick Steiner & Tannenbaum, New York City, Allen Ashley, Brooklyn, NY, Marc Newman, Newman & Berger, New York City, Israel Weinstock, Belle Harbor, NY.

## *OPINION AND ORDER*

ROSS, District Judge.

Plaintiff, Fidelity Funding of California, Inc. ("Fidelity" or "FFOC") has moved for partial summary judgment against defendants Isaac Reinhold, Mendel Kotlarsky, Michael Mendlovic, Masel Supply Company Corp. ("Masel"), Herbert Greenfield, Ciporah Greenfield, Thrifty Cosmetics & Sundries, Inc. ("Thrifty"), Joe Klein Dental Supplies & Equipment, Inc. ("Klein Dental"), United Talmudical Academy of Boro Park ("UTA"), Irving Goldstein, and Josef Goldstein [1] on causes of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") and for fraud. Additionally, Fidelity has moved for partial summary judgment (liability only) against defendant Marshall Shaw on its cause of action for conversion, and for summary judgment against Reinhold on a cause of action for breach of guaranty, and against Masel and Thrifty on its cause of action for dishonored checks.[2] Simultaneously with this opinion, the court is issuing a companion opinion granting a stay of the lawsuit as against defendant Michael Mendlovic. Accordingly, the court will not decide Fidelity's motion against Mendlovic, but grants in part and denies in part the remainder of Fidelity's summary judgment motion for the following reasons.

## *FACTUAL BACKGROUND*

Because plaintiff has moved for summary judgment against less than all of the defendants, the following summary of uncontested facts provides only the background necessary to understand the resolution of the motions currently pending before the court.

### *The Agreements*

Plaintiff Fidelity, wholly owned by plaintiff Fidelity Funding Financial Group, Inc. (previously dismissed from the case), is an asset-based lender that provides interest-bearing advances under revolving lines of credit to small- and medium-sized businesses. On January 12, 1995, Fidelity entered into Purchase and Sale Agreements

1. Defendants Herbert Greenfield, Ciporah Greenfield, Thrifty and Klein Dental (the "Greenfield defendants") have filed a joint memorandum opposing the motion, as have defendants UTA, Mendlovic, and Masel, whose joint opposition arguments have also been adopted by the Greenfield defendants. Defendants Irving and Josef Goldstein have filed no opposition to the motion. The court will refer to all of these defendants collectively as the "Account Debtor" defendants.

2. Fidelity had moved for summary judgment on some of its claims against Envirocam Inc., Chaim Piekarski, CP Industries and Jack Lefkowitz ("Envirocam defendants") and Leopold Mendlovic. Since the filing of its moving papers, however, Fidelity settled its claims against the Envirocam defendants and Leopold Mendlovic has been dismissed from the case.

(the "Agreements") with Micro Innovation Computer Center, Inc. ("Micro") and Maxum Systems, Inc. ("Maxum") whereby Fidelity would finance Micro and Maxum by advancing them money owed to them by their "Account Debtors," the persons or entities obligated on the accounts for which Fidelity advanced money to Micro or Maxum. The Agreements had two-year terms, Agreements, ¶ 12.4, and provided for Micro and Maxum to submit the invoices of Account Debtors to Fidelity. Fidelity would then buy the invoices from Micro and Maxum for eighty percent of the value of Micro's and Maxum's acceptable accounts receivable and would place the remaining twenty percent in a reserve account until the Account Debtors paid the amount of the invoice to Fidelity. Affidavit of Michael D. Haddad, Exh. 3. To facilitate these payments from the Account Debtors, in January 1995, Fidelity mailed some Account Debtors, including Masel, a letter informing them that Fidelity would be financing Micro's invoices and that they should remit payment to Fidelity rather than to Micro. Isaac Reinhold, President and sole shareholder of Micro and Maxum, served as a guarantor for Micro and Maxum.

*The Fraudulent Scheme*

Fidelity contends, and defendants do not deny, that Micro submitted to them fictitious invoices for Masel, Thrifty, UTA, and certain other Account Debtors. There is substantial evidence that the Account Debtors paid Fidelity for these invoices with money that Micro and Maxum provided either directly or through intermediaries. The cycle of Account Debtors paying for fraudulent invoices with money provided by Micro, which it in turn received from Fidelity for subsequent invoices, continued until Fidelity discovered the fraud in mid-July 1995.

*The Defendants' Fraudulent Activities*

Micro submitted twenty-four fictitious invoices from Thrifty. Various representatives of Thrifty, including a woman who identified herself as "Sylvia," falsely confirmed the fraudulent invoices. Thrifty paid Fidelity with money that Micro supplied either directly or through an intermediary. By way of example, on April 24, 1995, Micro wrote two checks for a total of $74,000 payable to "Joe Dental & Co." Those checks were endorsed by a stamp indicating that they were to be deposited in the account of Klein Dental, which is also owned by the Greenfields. *See* Affidavit of Record Custodian for Metropolitan State Bank, Exhs. D–7, D–8. Also on April 24, 1995, Thrifty issued a check for $73,926 to Micro. Affidavit of Jim B. Johnson, Exh. B–34. Then, on April 27, 1995, Klein Dental transferred $74,000 to Thrifty. Affidavit of Custodian of Records of Chase Manhattan Bank, Exh. B–4.

Another example: On May 30, 1995, Micro wired $33,176 directly to Thrifty. Metropolitan State Bank Aff., Exh. D–9, a transfer corresponding with Thrifty's May 25, 1995 payment of $33,250 to Fidelity. Once these transfers were complete, Micro had effectively reimbursed Thrifty almost the entire amount that Thrifty had paid to Fidelity for fraudulent invoices. Thrifty's Vice President Herbert Greenfield signed each of the Klein Dental checks made out to Thrifty and each of the Thrifty checks made out to Fidelity.

Fidelity's claims against Masel arise from actions that began prior to Fidelity's signing of the Agreements. As part of its routine investigation of Micro, Jo Ann Jernigan of Fidelity spoke by telephone with Michael Mendlovic, Vice President of Masel, who falsely represented that certain Masel invoices signified valid and legitimate purchases Masel made from Micro. Additionally, after Fidelity and Micro signed the Agreements, Mendlovic falsely confirmed in another phone call with Jim Johnson of Fidelity the bona fides of those false invoices. Other Masel representatives also falsely confirmed a number of other invoices that were fictitious. In total, Micro submitted thirty-five fictitious invoices from Masel, and Michael Mendlovic signed ten checks on behalf of Masel

that purported to constitute payment for many of these invoices. While Masel was sending checks to Fidelity to pay for the fictitious invoices, Micro was providing Masel with corresponding amounts of money.

Fidelity's claims against UTA involve twenty-two false invoices. Micro directly and indirectly provided the money that UTA paid to Fidelity for these fictitious invoices. The signature stamp of Irving Goldstein, the president of UTA, appears on five UTA checks mailed to Fidelity in payment for the fictitious invoices. One of these five checks was made payable directly to Fidelity. Johnson Aff., Exh. C-35. The record also establishes that Irving Goldstein himself served as an intermediary for a number of money transfers from Micro to UTA used to pay Fidelity for UTA's fictitious invoices. Further, the record shows that Irving Goldstein's son, Josef Goldstein, received money from Micro used to pay UTA's false invoices. Josef Goldstein, president and sole owner of BSD Acquisitions, Inc. ("BSD"), signed two checks to Fidelity on the account of BSD for payment of UTA's invoices. On the day after BSD's check to Fidelity for $166,118 was signed, Micro wired a transfer of $167,000 to an unidentified account at Citibank, and BSD's account shows a miscellaneous deposit of $167,000 for that same day. *See* Aff. of Custodian of Records for Citibank, Exhs. 1, 12, 13, 17; Aff. of Record Custodian for Metropolitan State Bank, Exh. B-6.

*The Fraud Discovered, the Scheme Unraveled and the Subsequent Looting of Assets*

In June 1995, a Fidelity audit discovered that Micro was borrowing large sums of money from defendant Atlantic Logic, Inc. ("Atlantic Logic"). As part of Fidelity's subsequent investigation, Jim Johnson of Fidelity met with Atlantic Logic's President, Richard G. Fletcher, Micro's President, Isaac Reinhold, Micro's CEO, William F. Jacob, and Micro's Secretary and Treasurer, Mendel Kotlarsky. At that meeting, Fletcher said that Atlantic Logic's invoices from Micro had been pre-paid, but that Micro's records reflected some $900,000 in outstanding invoices for Atlantic Logic. Fletcher also stated that Reinhold had told him that Micro had been submitting fraudulent invoices to Fidelity in a sum ranging between $4.6 million to $5 million. When Johnson asked Reinhold if Fletcher's statements were true, Reinhold said, "Yes." Johnson Aff., ¶¶ 74-75. Additionally, Kotlarsky identified for Fidelity a list of fraudulent and fictitious invoices. *Id.*, ¶ 76. Reinhold and Kotlarsky subsequently confirmed to Johnson that the accounts receivable were fraudulent and Reinhold indicated that he sought only to "bridge the gap" until Micro could obtain funds from its proposed initial public offering. *Id.*, ¶ 77.

Subsequent to this confession, Jack Lefkowitz, Chaim Piekarski, and other defendants transported the assets of Micro and Maxum from their common New Jersey warehouse to a new location in Brooklyn, New York, where those assets would be used in a new corporation called Maxxum Computing, Inc. ("Maxxum"). Defendant Marshall Shaw is charged with involvement in this aspect of the scheme. Maxxum operated out of Brooklyn until at least August 1995. Its operations halted only after a private investigator hired by another creditor (AT & T) discovered Micro's and Maxum's former inventory, equipment, books and records in Brooklyn and seized them. *Id.*, ¶ 153.

From this fraudulent activity, Fidelity claims to have suffered $5,368,327.62 in out-of-pocket losses. The evidence indicates that $2,975,459 of that amount is attributable to unpaid fictitious invoices of defendants named in this motion for partial summary judgment. That figure is calculated based on the fact that defendant Masel has unpaid invoices totaling $1,067,100; defendant Thrifty has unpaid invoices totaling $974,868; and defendant UTA has unpaid invoices totaling $933,491. Including the expected profits never realized, Fidelity calculates that the total amount of

damages it suffered directly from the fraud amounts to $6,934,632. *See* Plaintiff FFOC's Mem. of Law, at 23.

## *DISCUSSION*

### I. *Standard for Summary Judgment*

A party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists and that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there are material issues in dispute, the court must draw all factual inferences and view all factual assertions in favor of the nonmoving party. *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id.* Conclusory allegations, speculation and conjecture do not create a genuine issue of material fact. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990).

### II. *Choice of Law*

With respect to the RICO claims, federal law governs. As to the state law claims, in a prior motion to dismiss, this court found that Texas and New York law were substantially the same and that because all parties had briefed New York law, the court would apply it. Because the parties have briefed only New York law for this motion, the court will apply New York law for all the state law claims except the cause of action for breach of guaranty. *See Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52–53 (2d Cir. 1984) (applying New York law where the parties relied primarily upon New York authorities in brief and where there was no material difference between New York and Illinois law). As to the claim for breach of guaranty, the agreements provide that New Jersey law governs. *See* Haddad Affidavit, Exhs. 4 & 5.

### III. *The Effect of the Fifth Amendment Assertion*

Because of actual or pending criminal indictments against many of the defendants in this case, each of the defendants (except Marshall Shaw) has asserted his or her Fifth Amendment privilege and refused to answer questions regarding the alleged fraud. Plaintiff argues that, when combined with the other evidence in the record, the court should draw an adverse inference against the defendants based on their invocation of the privilege.

█ While plaintiff is certainly correct in pointing out that a court is permitted to draw an adverse inference in a civil proceeding from a party's invocation of the Fifth Amendment privilege, *see Baxter v. Palmigiano,* 425 U.S. 308, 318–19, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the evidence produced by a nonmoving party's silence is not sufficiently weighty to carry a moving party's burden in a motion for summary judgment. In other words, the plaintiff's motion for summary judgment must stand or fall on the merits of the evidence adduced. As the Supreme Court has noted, "while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness ... declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production." *United States v. Rylander,* 460 U.S. 752, 758, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).

The propriety of drawing an inference against the defendants in this action based on their invocation of the privilege is especially problematic in the context of a motion for summary judgment, where a court is admonished to construe all evidence, including the defendants' silence, in a light most favorable to the non-moving party. *See LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 391 (7th Cir.1995) ("Treating

[the defendants'] silence as a separate piece of evidence supporting the Bank's motion for summary judgment and drawing inferences against [them] on the basis of that fact seems to be in tension with the ordinary summary judgment rule that all reasonable inferences must be drawn in favor of the nonmovant."). While it is settled law that a trier of fact may draw an adverse inference in a civil action against a party who invokes the Fifth Amendment privilege, the court in deciding this summary judgment motion is in a far different posture than a post-trial trier of fact. Accordingly, the court will not rely on any adverse inferences in its evaluation of the evidence for the purposes of this summary judgment motion.

IV. *Fidelity's Fraud Claims*

Fidelity seeks summary judgment on its fraud claims against Reinhold, Kotlarsky, and the Account Debtor defendants (other than Klein Dental), *see* Amended Compl., First Cause of Action, and on its claim for aiding and abetting fraud against Klein Dental, *see* Amended Compl., Second Cause of Action.

A. *Fraud*

To prove common law fraud under New York law, a plaintiff must demonstrate "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir.1995). Plaintiff must demonstrate each element of fraud by clear and convincing evidence. *Id.* Reinhold and Kotlarsky have not opposed this motion. In light of their admissions to Johnson, there is no genuine issue of material fact regarding whether they committed each of the elements of fraud. The Account Debtor defendants, however, (apart from Irving and Josef Goldstein, who have not opposed plaintiff's motion), contest each element of the fraud claim.

1. *Material misrepresentations*

Fidelity points to two sets of statements made by Account Debtor defendants that may be material misrepresentations. First, a number of the defendants told Fidelity representatives during telephone conferences that invoices evidenced legitimate sales of goods by Micro. Second, some Account Debtor defendants signed or issued checks to Fidelity in payment of invoices that did not represent actual sales of goods. For the individual defendants, Fidelity must demonstrate that they "participated in [the fraud] or have actual knowledge of" the fraud. *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807, 587 N.Y.S.2d 279, 599 N.E.2d 683 (1992). Each business entity Account Debtor is liable for the actions of its agents who were acting within the scope of their real or apparent authority. *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir.1989) (finding corporation liable for agent's fraud).

Defendants do not dispute that the representations in telephone conversations, if made, are material and false. Instead, they argue that there is a genuine issue of material fact regarding whether they ever made representations in the telephone conversations about the validity of the invoices as a reflection of goods actually sold and delivered. Additionally, the Greenfield defendants argue that there is a genuine issue of material fact surrounding their personal participation in making representations.

The Account Debtor defendants who have answered the motion argue that Jo Ann Jernigan of Fidelity may have asked the Account Debtors only whether they had received invoices from Micro and not whether they had received the merchandise relating to the invoices. The distinction the defendants seek to make is that while an Account Debtor who claimed actual receipt of the merchandise associated

with an invoice would be making a false statement, an Account Debtor who stated only that he had received an invoice would be making a true statement.

The court need not decide whether an Account Debtor's mere acknowledgement of receipt of an invoice would support a fraud claim, however, because it is clear by looking at Jernigan's testimony as a whole that her standard practice was to ask whether the Account Debtor had received the merchandise. *See* Jernigan Deposition, 601:8–15; 602:10–15, 612:2–9; 627:3–12; 636:25–637:8; 693:3–21; 769:14–22; 782:14–21. Indeed, in response to questioning about whether Jernigan assumed that merchandise was received in the absence of any statements denying it, Jernigan replied that it was her practice to ask whether the Account Debtor received the merchandise at the beginning of each phone conversation. *Id.*, at 697:10–698:25. Additionally, she explained that she was verifying merchandise, not invoices. *Id.*, at 704:20–705:2. Thus, no reasonable jury could find that Jernigan's questions were related solely to invoices. Accordingly, her lack of notation regarding whether merchandise was received supports the contention that Account Debtors falsely avowed to Fidelity that they had received merchandise from Micro.

The Greenfield defendants claim that there is no evidence that the people with whom Jernigan spoke who claimed to be Thrifty representatives actually knew of Fidelity's relationship with Micro and Thrifty. It is well settled, however, that a principal is liable for the actions of its agents who were acting within the scope of their real or apparent authority. *Citibank, N.A.*, 878 F.2d at 624 (finding corporation liable for agent's fraud). The Greenfield defendants concede that regardless of whether the individuals who spoke with Jernigan personally knew of Fidelity's financing role, the statements that they made were materially false. Thus, because the uncontroverted evidence shows that Thrifty representatives falsely told Jernigan that the invoices represented bills for actual merchandise. Thrifty is deemed to have made the material misrepresentations of its agents.

Ciporah Greenfield herself claims that there is no evidence of her personal participation in the fraud. The only allegations of her personal involvement relate to phone conversations that Jernigan had with a Thrifty representative who gave the name "Sylvia." Fidelity argues that Ciporah Greenfield uses the name Sylvia and that she is the "Sylvia" with whom Jernigan spoke. In support of this theory, Fidelity introduces a Dun & Bradstreet report that identifies "Sylvia Greenfield" as Thrifty's President and compares it with Thrifty's corporate documents submitted to Chase Manhattan bank, which identify "Ciporah" or "Tzipporah" Greenfield as, variously, Thrifty's President or Vice President. Fidelity also asks the court to draw a negative inference from Ciporah Greenfield's invocation of her Fifth Amendment privilege in response to a deposition question as to whether she ever used the name Sylvia.[3] Fidelity obtained the Dun & Bradstreet report from Micro, *see* Johnson Aff., ¶ 32, and has made no showing on this motion of why the court should consider the report despite the hearsay and authentication rules. Absent the report or any other information affirmatively suggesting that Ciporah Greenfield uses the name Sylvia, her alleged invocation of the Fifth Amendment privilege in response to a deposition question, as the court noted above, is insufficient to render this issue one on which no reasonable trier of fact could find for Ciporah Greenfield. Accordingly, the court denies Fidelity's motion for sum-

3. Fidelity does not include the relevant portion of Ciporah Greenfield's deposition in its papers, but Ciporah Greenfield does not dispute Fidelity's contention. Because Ciporah Greenfield's alleged assertion of her Fifth Amendment privilege does not affect the court's determination of this motion, the court need not obtain any affirmative proof that she did in fact assert the privilege in response to this question.

mary judgment against Ciporah Greenfield on the fraud causes of action.

■ Another defense theory, raised by the Greenfield defendants in the context of material representations and by the other Account Debtor defendants in the context of *scienter*, is that the defendants did not know Fidelity's role and therefore cannot be said to have been making any representations to Fidelity merely by sending the checks. The Greenfield defendants also argue that the checks do not serve as representations that the Account Debtors were paying for goods actually received. With regard to the first contention, while it is true that under New York law a defendant has no general liability for misrepresentations relied on by merely "foreseeable users," *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962 (E.D.N.Y.1988), vacated in part on other grounds by *In re Crazy Eddie Securities Litigation*, 714 F.Supp. 1285 (E.D.N.Y.1989), whether or not the defendants here knew that Fidelity was a factor or was interested in the authenticity of their transactions for other reasons is simply not determinative. Absent privity, New York law requires only "that a defendant was aware of a specific party or class of parties which intended to rely upon the defendants' statement." *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1062 (S.D.N.Y.1989). Because Fidelity relied upon the fraudulent invoices not as a "mere member of the public," but rather as a member "of a settled and particularized class," *White v. Guarente*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977), defendants would be liable to Fidelity even in the absence of a sufficient showing of knowledge regarding Fidelity's specific role as a factor. Regardless, as the court concludes below with regard to *scienter*, there is no genuine issue of material fact regarding whether the Account Debtor defendants knew of Fidelity's role.

■ Herbert Greenfield's second argument is that a check is not a representation of payment for goods actually received. The Second Circuit has made clear that the negotiation of a check may be a representation. *See United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (finding that defendant had falsely represented to bank that he had the authority to deposit falsely procured checks), *cert. denied* 502 U.S. 1101, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992). Additionally, the court in *Amalgamated Bank of New York v. Marsh*, 823 F.Supp. 209, 217–218 (S.D.N.Y.1993), sustained fraud claims against defendants who issued or cashed checks knowing that the checks did not reflect legitimate transactions. The court's decision acknowledges that both the issuer and the depositors of the checks represented that the checks signified valid transactions. *See also Farberware, Inc. v. Groben*, 1991 WL 123964, at *10 (S.D.N.Y. July 3, 1991) (dismissing fraud claim on pleading grounds but implicitly acknowledging that value of a check is a representation of value of goods and services supposedly exchanged for check); *Sendar Co., Inc. v. Megaware, Inc.*, 1988 WL 31873, at *4 (S.D.N.Y. Mar.11, 1988) (same).

2. *Scienter*

■ With regard to *scienter*, the fraudulent intent of the Account Debtors appears obvious. Indeed, there is no other plausible purpose for falsely confirming and paying for fictitious invoices other than to defraud the factor. Adding to these false statements the fact that Micro was channeling money to the Account Debtors, often through indirect means, it is clear that there is no genuine issue of material fact regarding whether the Account Debtors who made material misrepresentations to Fidelity had the requisite intent to defraud Fidelity.

The answering Account Debtor defendants raise two argument with regard to the *scienter* component of fraud. First, they allege that they did not know what Fidelity's role was in relation to Micro and Maxum, and that as a result one may not infer that they intended to defraud Fideli-

ty when they falsely informed Fidelity that the invoices represented actual merchandise exchanges. However, the record reflects that Jim Johnson of Fidelity mailed a notification letter to Masel on January 18, 1995. *See* Johnson Aff., ¶ 12 & Exh. E–3; Johnson Dep. at 236–37 & Ex. 45.[4] Moreover, Masel and UTA actually each made one check payable to Fidelity, Johnson Aff., Exhs. A–50 & C–35. Additionally, those companies, as well as Thrifty, mailed payments to Fidelity in Dallas, Texas, and a Thrifty representative confirmed Fidelity's address in Dallas. Jernigan Dep. 692:19–693:2. Finally, it is not plausible that the Account Debtors could confirm to Fidelity the validity of accounts receivable invoices and make payments with money that Micro provided for the amounts of the accounts receivable to Fidelity's address in Dallas, and yet believe that Fidelity played no role in the transaction other than as a collection agent. Were Fidelity merely a collection agent, the almost simultaneous and equal exchange of funds between Micro and the Account Debtors would serve no purpose. Thus, no reasonable juror could conclude that Masel, Thrifty and UTA were unaware of or misunderstood Fidelity's role as a factor for Micro.

The Mendlovic defendants additionally argue that their transactions with Micro may have involved arrangements by which the Account Debtors were obligated to pay Micro even though there was no direct delivery of the merchandise. Thus, the argument runs, the Account Debtors may have had an honest intention to pay off invoices even though they had received no goods. In the absence of any facts in the record to support this theory, it cannot create a genuine issue of material fact regarding whether defendants' claims that they had received merchandise from Micro were fraudulent. To put it another way, no reasonable juror would accept this unsupported theory rather than acknowledge that the Account Debtors made fraudulent misstatements to Fidelity.

3. *Actual Reliance*

■ Defendants argue that Fidelity has not established the reliance element of fraud because Fidelity paid for invoices before it even attempted to confirm the validity of those invoices. However, defendants misconstrue Fidelity's reliance theory. Fidelity does not argue that it relied on the false confirmations in paying for the invoice falsely confirmed. Instead, Fidelity representatives affirmed that the company "would not have advanced any money to Micro if it had known that *any* of the invoices ... were fraudulent and fictitious." Affidavit of Michael Haddad, ¶ 29 (emphasis added); *accord* Johnson Aff., ¶¶ 24, 37, 47, 59. Thus, while Fidelity may not have relied upon the first false confirmation in paying for that invoice falsely confirmed, Fidelity did rely on that false confirmation in its decision to pay all subsequent Micro invoices. Consequently, Fidelity did actually rely detrimentally on the Account Debtor defendants' false statements because it advanced money to Micro for false invoices for which Fidelity never received payment. *See Duncan v. Stoneham*, 253 N.Y. 183, 186–87, 170 N.E. 571 (1930). However, because actual reliance is a necessary element for the recovery of damages in a fraudulent misrepresentation action, it is necessary to identify with precision those fraudulent invoices purchased by plaintiff after each Account Debtor made its first misrepresentation. *See Citytrust v. Atlas Capital Corp.*, 173 A.D.2d 300, 303, 570 N.Y.S.2d 275 (1st Dept. 1991) (limiting plaintiff's reliance claim in fraudulent invoice scheme to invoices issued after date of defendant's negligent verification).

4. Johnson prepared a document that reflected that he notified Masel, Thrifty and UTA by facsimile and by Federal Express on July 19, 1995, of Fidelity's status under Article 9 of the Uniform Commercial Code. Johnson Dep. at 236–37 & Ex. 45. However, such notification would not have given notice to the Account Debtors, as they made their representations to Fidelity before that date.

Of the twenty-four invoices that Fidelity purchased from Thrifty, eighteen were purchased after Thrifty's first false representation to Fidelity, on February 13, 1995. However, the invoice list for Thrifty shows that all of the outstanding unpaid invoices (totalling $974,868) were issued and purchased on April 26, 1995 or later, which is subsequent to Thrifty's first misrepresentation. *See* Johnson Aff. Exhs. B–1 & B–2. Fidelity, therefore, actually relied upon Thrifty's misrepresentations in purchasing the entire sum of unpaid invoices, which the uncontroverted evidence indicates amounts to $974,868. *See* Johnson Aff. Exh. B–2.

Plaintiff also submits that UTA is liable for $933,491 in unpaid invoices. The undisputed evidence indicates that UTA first verified a fictitious invoice on February 27, 1995, and that sixteen of the twenty-two UTA invoices were purchased after that date. *See* Johnson Aff. Exhs. C–1 & C–2. The sixteen invoices that postdate February 27 total $919,586. Fidelity's actual reliance upon UTA's misrepresentation, therefore, is limited to that amount.

Finally, the evidence indicates 35 Masel invoices purchased by Fidelity beginning January 26, 1995. According to the undisputed evidence, Masel falsely represented the validity of the first invoice issued. *See* Johnson Aff. Exh. A–1, FFOC's Rule 3(g) Statement, ¶¶ 22–23. Fidelity thus actually relied upon Masel's misrepresentations in purchasing all of the unpaid Masel invoices that remain outstanding to Fidelity, which amounts to $1,524,373. *See* Johnson Aff. Exh. A–2.

4. *Justifiable reliance*

█ The answering Account Debtor defendants also argue that Fidelity cannot succeed on its fraud claims because its reliance on the defendants' statements was not reasonable or justifiable. As the Second Circuit has explained, where a

> representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable. Moreover, 'decisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts.'

*Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989) (quoting *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 81 (2d Cir.1980): other citations omitted). However, when the information is peculiarly in the possession of the defendants, then plaintiff may rely without prosecuting an investigation even where plaintiff could have determined the truth with relatively modest investigation. *Mallis,* 615 F.2d at 80. Thus, courts may find that a plaintiff's reliance was unreasonable where "the relevant facts were easily accessible to the relying party." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1542 (2d Cir.1997), *cert. denied,* 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112, 1997 WL 428569 (Oct. 6, 1997).

Defendants argue that Fidelity ignored such warning signs as its difficulty reaching the defendants, suspicious documentation and delivery procedures, unusual quantities within shipments, and the particularly close relationship between Micro and various Account Debtors. Defendants do not argue that following up on these indications would have led Fidelity to uncover the truth. Instead, defendants argue, Fidelity might have terminated its factoring arrangement with Micro had it heeded them. Defendants' argument supports the conclusion that the facts underlying the fraud were particularly within the defendants knowledge and thus did not create a duty on Fidelity's part to investigate the underlying facts. That Fidelity undertook an investigation to protect its

interests does not make defendants' duplicity any more public in nature.

This case is also readily distinguishable from cases such as *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 738 (2d Cir.1984) and *Lazard Freres,* 108 F.3d at 1542, in which the Second Circuit found that the plaintiffs, as sophisticated businesses, could not have reasonably relied on fraudulent misrepresentations because they had not inquired about or examined the relevant information to which they had access. In this case, Fidelity did make appropriate and relevant inquiries; defendants' false answers to those inquiries have led to this lawsuit. No reasonable juror could find that Fidelity failed to exercise "minimal diligence" to "negate[ ] its own recklessness" or even that Fidelity failed to meet a heightened degree of diligence necessitated by hints of falsity. *See Banque Franco–Hellenique de Commerce Intern. et Maritime, S.A. v. Christophides,* 106 F.3d 22, 27 (2d Cir. 1997) (describing duty of diligence required to demonstrate justifiable reliance). Thus, because Fidelity's reliance upon the statements of the defendants regarding information peculiarly within their knowledge is deemed justifiable under New York law, there is no genuine issue of material fact regarding the reasonableness of Fidelity's reliance on defendants' statements.

5. *Causation*

Finally, defendants argue that Fidelity has failed to demonstrate that defendants' fraud was the proximate cause of their injuries. Proximate cause is an element of a common law fraud claim in New York. *Kregos v. Assoc. Press,* 3 F.3d 656, 665 (2d Cir.1993), *cert. denied,* 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 307 (2d Cir.1986) ("Under New York law, damages for fraud must be a direct result of the fraudulent misrepresentation."). Just as in the issue of actual reliance, Fidelity's theory on proximate cause is based on its representatives' affirmations that the company "would not have advanced any money to Micro if it had known that *any* of the invoices ... were fraudulent and fictitious." Affidavit of Michael Haddad, ¶ 29 (emphasis added); *accord* Johnson Aff., ¶¶ 24, 37, 47, 59. Thus, each fraudulent misrepresentation served as a proximate cause of Fidelity's funding of subsequent invoices for which Fidelity never received repayment. Consequently, as a matter of law, each misrepresentation was a proximate cause of Fidelity's loss.

B. *Aiding and Abetting Fraud*

In order to state a claim for aiding and abetting fraud, a plaintiff must demonstrate the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission. *Franco v. English,* 210 A.D.2d 630, 633, 620 N.Y.S.2d 156, 159 (1st Dept.1994). "Awareness and approval, standing alone, do not constitute substantial assistance." *Armstrong v. McAlpin,* 699 F.2d 79, 92 (2d Cir.1983). Though there is no New York state case law on point, the Second Circuit's decisions on aiding and abetting securities fraud have required that the "substantial assistance" be a proximate cause of the alleged fraud, *see, e.g., Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979) (prior to Supreme Court decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), holding that there is no liability for aiding and abetting a 10b–5 violation, finding that aiding and abetting a 10b–5 violation requires that substantial assistance proximately cause the fraud), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980), and such a requirement would likely apply to the tort of aiding and abetting fraud.

Fidelity has moved for summary judgment against Klein Dental on its claim for aiding and abetting fraud. *See* Compl.,

Second Cause of Action.[5] As described above, Fidelity has amply demonstrated the first element—existence of a fraud. Moreover, the conclusion is inescapable that somebody at Klein Dental knew of the overall fraudulent scheme, particularly because Klein Dental and Thrifty share the same owners and because Micro channeled money to Thrifty through Klein Dental. The only remaining issue is whether Klein Dental's function as a conduit of funds between Micro and Thrifty constitutes substantial assistance to the fraud. On this issue, there exists a genuine issue of material fact. A reasonable juror could find that the assistance Klein Dental provided to the scheme was not substantial—Micro could have provided the money directly to Thrifty as it in fact did on another occasion. All that Klein Dental did, through Herbert Greenfield, was endorse and write checks that made the scheme (marginally) more difficult to detect. The scheme, however, certainly could have operated without Klein Dental's participation. Thus, there is a genuine issue of material fact as to whether Klein Dental provided substantial assistance to the fraud, and the court must therefore deny summary judgment to Fidelity on its aiding and abetting fraud claim against Klein Dental.

C. *Liability*

Having found certain of the Account Debtor defendants liable to Fidelity for fraud, the court must determine the extent of each of those defendant's liability. Fidelity argues that "each of the defendants, as joint tortfeasors, are jointly and severally liable for the entire amount of the damage award." Plaintiff FFOC's Memorandum of Law, at 23. As a general matter, it is true that under New York law, "[w]hen an independent basis for fraud can be established ... a conspirator, having joined the conspiracy and taken steps to assure its success, may be held responsible for the acts of his coconspirators in furtherance of their scheme. Indeed, all conspirators are liable, jointly and severally, as tortfeasors." *Epstein v. Haas Securities Corp.*, 731 F.Supp. 1166, 1187–88 (S.D.N.Y.1990) (citation omitted); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Arcturus Builders Inc.*, 159 A.D.2d 283, 552 N.Y.S.2d 287, 288 (1st Dept.1990) ("[U]nder New York law, the liability of coconspirators is joint and several, notwithstanding the amount of any direct benefit conferred upon them through a fraudulent transaction.").

These principles, however, apply in the instant case to the extent that, as a matter of law, the tortfeasors can be said to have joined the conspiracy, or at the least, to have acted "in concert or unity of action," 60 N.Y.Jur.2d Torts § 30 (1992). According to the Second Circuit, "[t]he essence of conspiracy, of course, is agreement, and in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Martino*, 664 F.2d 860, 876 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). A finding of concert or unity of action would seem to require the same.

Therefore, in order to impose joint and several liability on the Account Debtor defendants in the instant case, Fidelity must prove that each Account Debtor had some knowledge that a conspiracy extending beyond its own individual acts of fraud existed, or that its actions were part of a "common design." As one New York court explained,

> A common design is the essence of a conspiracy, and while it is not essential to one's liability for ensuing damages that he shall have joined in the beginning, or that he should have complete

5. Although Fidelity's Second Cause of Action in the Complaint alternatively states a claim for conspiracy to commit fraud, Fidelity has not moved for summary judgment against Klein Dental on that theory.

> knowledge of all the aims of the conspirators, or that he take part in each branch of the conspiracy, or that he even know of all the steps taken toward the common design, it nevertheless is necessary that there be *intentional participation with a view to the furtherance of the common design.* Mere knowledge of the common design, or even acquiescence therein or approval thereof, although affecting the moral quality of an act done for a different purpose which does in fact aid in the accomplishment of the design, does not make the doer of such act jointly and severally liable for all damage resulting from the conspiracy.

*Ballantine v. Ferretti,* 28 N.Y.S.2d 668, 691 (Sup.Ct.1941) (emphasis added).

In the instant case, for the purposes of this summary judgment motion the court finds sufficient evidence of fraudulent acts committed by the remaining Account Debtor defendants to render summary judgment against those defendants for the amount in damages resulting from their own fraudulent submissions of false invoices. However, because Fidelity has not made a sufficient evidentiary showing as to the degree to which each or any Account Debtor defendant intentionally participated in the fraud against Fidelity "with a view to the furtherance of the common design," or that the Account Debtor defendants were aware of the existence of a larger conspiracy, or were aware of the extent to which the other Account Debtors were engaged in the same fraudulent activity, the court cannot at this stage in the proceedings impose joint and several liability on the Account Debtor defendants for fraudulent misrepresentations occurring outside the scope of their immediate ken. In other words, the court concludes that each remaining Account Debtor defendant can be held liable on this summary judgment motion only for damages flowing from the scheme with regard to which such Account Debtor can be said to have had knowledge as a matter of law.

In analyzing this issue, it helps to envision the fraudulent scheme perpetrated on Fidelity as a hub and spoke conspiracy, with Micro and Maxum and their principals forming the hub, and each distinct group of Account Debtors, such as the Thrifty defendants, the Masel defendants, and the UTA defendants, constituting separate spokes. While each member of a spoke is aware of the extent of fraud occurring in his or her own particular spoke, only those at the hub of the conspiracy are necessarily aware of the scope of the fraud occurring throughout the entire wheel. Because of the uncertainty that remains regarding the extent that those at the spokes were not cognizant of the common design, joint and several liability for their individual acts of fraud may not be appropriate, at least not until a further factual showing on the matter is made.

*United States v. Incorporated Village of Island Park,* 888 F.Supp. 419 (E.D.N.Y. 1995), presents a somewhat analogous fact pattern to the instant case. In *Island Park,* various government officials of an incorporated village in Nassau County were accused of conspiring to manipulate a federally-subsidized housing program in order to confer benefits on special friends and family and to undermine the racial desegregation goals of the program. In executing the plan, Scully, a village official in charge of administering the program, preselected persons in contravention of the proper "first-come first-served" selection principles mandated by federal law. At Scully's direction, favored persons were instructed to file their applications at such a time so as to ensure that they received the subsidized housing grants. After presenting a prima facie case showing these facts, the government moved for summary judgment against, *inter alia,* the homeowners who had participated in the scheme, asserting joint and several liability against each of them for its claim of erro-

neous payment of government funds. Judge Glasser concluded that:

> Because the government has not established either the existence of a conspiracy or the Homeowner Defendants' knowing participation in the pre-selection scheme, this court will not impose joint and several liability against the Homeowner Defendants for all payments made pursuant to the scheme.

*Id.* at 454–55. Instead, the court ruled that the government was entitled to summary judgment against each Homeowner to the extent that funds had been wrongfully expended on their individual behalf. *Id.* at 455.

The court finds Judge Glasser's resolution of the Homeowners' liability in *Island Park* instructive in the instant case, and chooses a similar course. Having examined the evidence, the court concludes that the record at this juncture is sufficient only to hold the Account Debtors considered in this motion liable for that portion of the scheme representing each Account Debtor's own spoke of the conspiracy, not the entire wheel. The evidence presented supports the conclusion that, as a matter of law, each Account Debtor knew of the scheme, and was aware of its scope insofar as it pertained to activity in which it had directly participated. But as to assigning broader liability to the Account Debtor defendants, the court concludes that material issues of fact remain, namely, whether each Account Debtor defendant knew that the scheme extended beyond its own spoke and encompassed the other spokes as well. Nothing regarding the nature of the scheme in which each Account Debtor defendant participated necessarily imparted knowledge that Micro and Maxum also defrauded Fidelity by use of other account debtors. *Cf. U.S. v. Martino,* 664 F.2d 860, 876 (2d Cir.1981) ("[I]n many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture."). Plaintiff argues that the defendants' familial ties, or their common membership in the Hasidic community, provides a sufficient basis for imputing knowledge of the other spokes of the conspiracy. The court, however, is unwilling to presume knowledge based solely on such circumstantial evidence. At this stage of the proceedings, at any rate, the court is unable to conclude as a matter of law that the individual Account Debtor defendants had the requisite knowledge of the common conspiratorial enterprise to hold all jointly and severally liable for all of Fidelity's damages.

Of course, those defendants who share a place at the perimeter of each spoke, as do Herbert Greenfield and Thrifty, and UTA and Irving and Josef Goldstein, remain jointly and severally liable for the damages resulting from the activities occurring within their spokes, since the court finds that the requisites of "intentional participation with a view to the furtherance of the common design," *Ballantine,* 28 N.Y.S.2d at 691, have been amply satisfied with respect to these more discrete individual conspiracies.

V. *The RICO Claims*

Fidelity's third cause of action alleges that Reinhold, Kotlarsky and the Account Debtor defendants, together with named defendants, have violated 18 U.S.C. § 1962(c), which is part of the RICO Act. Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering....

18 U.S.C. § 1962(c). To state a claim under § 1962(c), therefore, a plaintiff must allege seven constituent elements, namely "(1) that the defendant (2) through the commission of two or more acts (3) consti-

tuting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

Defendants raise four arguments with regard to Fidelity's substantive RICO claim. First, defendants argue that the mail and wire fraud predicates pose genuine issues of material fact in the same fashion as the state law fraud claims. For the reasons described above, and with the exception of Ciporah Greenfield and Klein Dental, the court finds defendants' arguments with regard to the predicate acts of fraud unpersuasive. As to Ciporah Greenfield and Klein Dental, for the same reasons Fidelity was denied summary judgment with regard to its fraud and aiding and abetting fraud claims, Fidelity is also denied summary judgment on its RICO claim. Additionally, the Account Debtor defendants claim that there are genuine issues of material fact regarding the enterprise, continuity, and management aspects of Fidelity's RICO claims. For the reasons stated below, the court denies summary judgment to Fidelity on its RICO claims against the remaining Account Debtor defendants, but grants summary judgment to Fidelity on its RICO claims against Reinhold and Kotlarsky.

A. *Enterprise*

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering...." 18 U.S.C. § 1962(c). Thus, to prove a violation of Section 1962(c), Fidelity must demonstrate the existence of a valid enterprise. The RICO statute defines an enterprise as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Complaint alleges as enterprises for RICO purposes: (1) Micro, (2) Maxum, and (3) an association in fact consisting of a wheel arrangement, with Micro and Maxum and their employees as the hub and the Account Debtors and their employees as the various spokes of the wheel. Compl., ¶ 183. The court finds that there is no genuine issue of fact regarding the existence of an enterprise consisting of an association in fact in a wheel arrangement as described in the Complaint.

Defendants assert without citing to or proffering any facts that if they are able to testify at a trial, their testimony will raise unspecified issues regarding the enterprise element of a RICO claim. The court presumes that the genuine issues of material fact that defendants would attempt to identify relate to the structure of the enterprise and to the operation and management of it. An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). A plaintiff may prove the existence of an enterprise through "evidence of an ongoing organization, formal or informal, and [through] evidence that the various associates function as a continuing unit." *Id.* As noted above in the court's analysis of Fidelity's fraud claims, Fidelity has alleged in its Complaint a "hub-and-spoke" arrangement, where Micro and Maxum served as the twin hubs and other defendants, including the Account Debtor defendants, served as the spokes. Whether or not this alleged arrangement adequately constitutes a non-RICO conspiracy, *cf. Kotteakos v. United States,* 328 U.S. 750, 755, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (finding variance between single conspiracy charged and multiple, separate conspiracies proved where prosecution failed to demonstrate rim connecting spokes), it is sufficient to constitute a RICO enterprise. *See United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.)

("[T]hrough RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise."), *cited with approval in United States v. Friedman,* 854 F.2d 535, 562 (2d Cir.1988). Thus, the enterprise concept broadens the scope of proper RICO defendants beyond the group that could be liable under a conspiracy theory involving the same actions. *United States v. Gallo,* 668 F.Supp. 736, 747 (E.D.N.Y.1987) (Weinstein, C.J.) (finding that enterprise notion in RICO "furnishes prosecutors a much broader scope of authority for joining defendants who are alleged to have participated in a common grouping or association" than did traditional theoretical conceptions of conspiracy). Here, Fidelity adequately alleges the interaction between the defendants and therefore the structure of the enterprise. *United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir.1991) ("Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it does, rather than by abstract analysis of its structure.' " (citations omitted)), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).

B. *Continuity*

Because Congress intended RICO to apply to "long-term criminal conduct" rather than to "sporadic activity," it is not enough that a plaintiff allege related acts. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Instead, "[t]o establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *Id.* at 240, 109 S.Ct. 2893. The Supreme Court has explained that " '[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept." *Id.* at 241, 109 S.Ct. 2893. *See also GICC Capital Corp. v. Tech. Fin. Group, Inc.,* 67 F.3d 463, 467–68 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996) (finding that durational approach is "required to effectuate Congress's intent to target 'long-term criminal conduct,' " and that plaintiffs must demonstrate that defendants' activities are "neither isolated nor sporadic" (citations omitted)). Thus, in order to establish a viable RICO claim, a plaintiff must demonstrate long-term criminal activity that is both frequent and extended. The plaintiff must allege activity that occurred over a closed and substantial period of time or, if the action is brought before a substantial period of activity has taken place, "a distinct threat of long-term activity, either implicit or explicit." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. Because Fidelity has demonstrated open-ended continuity based on the threat that defendants would engage in long-term criminal conduct, it has met RICO's continuity requirement.

"Open-ended continuity" refers to "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.* 492 U.S. at 241, 109 S.Ct. 2893. By way of example, the Supreme Court posited that open-ended continuity may be established "if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit," *id.* at 242, 109 S.Ct. 2893, or if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* The scheme in this case involves acts that are "neither isolated nor sporadic," *GICC Capital Corp.,* 67 F.3d at 467, and that were particularly likely to continue into the future. Fidelity has demonstrated that Thrifty, UTA and Masel confirmed some 81 fraudulent invoices during a six-month time span. In order to pay back these fraudulent invoices, the defendants submitted additional fraudulent invoices. Had Fidelity not uncovered the scheme, the defendants undoubtedly would

have submitted more fraudulent invoices in order to obtain the money needed to pay off the amount due to Fidelity for the previously-submitted invoices. Defendants do not dispute the sufficiency of the number of fraudulent acts nor do they contend that those acts would have diminished in frequency or quantity after July 1995 if Fidelity had not uncovered the fraud. Thus, Fidelity has proven a scheme of past conduct that by its nature projects into the future with a threat of repetition and therefore has demonstrated open-ended continuity.

C. *Conducting the Affairs of the Enterprise*

Defendants next contend that they are not liable under RICO because they were not sufficiently involved in the enterprise to have "conducted" its affairs within the meaning of the statute. They base this argument on the Supreme Court's holding in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), which restricted RICO liability to defendants who "participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. 1163. *Reves* concluded that an enterprise may be operated not only by upper management but also by lower rung participants under the direction of upper management and by outsiders associated with the enterprise who exert control over it. *Id.* at 184, 113 S.Ct. 1163. While *Reves* distinguished members of an enterprise from its associates and implied a greater ability of members to operate the enterprise, the Court specifically left open the question of how far down the ladder of operation liability extends because the petitioner in that case was an outsider who clearly was not exerting control over the enterprise. *Id.* at 184 n. 9, 113 S.Ct. 1163.

Fidelity argues that this court should follow the First Circuit's opinion in *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994), *cert. denied,* 513 U.S. 1177, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995), which found that insiders to an enterprise who carried out orders meet the requirements of *Reves.* However, this court is not free to accept or reject the *Oreto* decision, because the Second Circuit has made clear that the *Reves* test is met only when the defendant has "appreciable discretionary authority." *United States v. Viola,* 35 F.3d 37, 43 (2d Cir.1994) (reversing conviction of defendant who "was not on the ladder at all, but rather, as [a] janitor and handyman, was sweeping up the floor underneath it"); *see also United States v. Miller,* 116 F.3d 641, 673 (2d Cir.1997) (reviewing RICO defendants to determine whether they had "responsibility" and "discretion" such that they "supervised" and "managed" the enterprise). Following the standard applied in the Second Circuit, this court finds that a reasonable juror could conclude that the Account Debtor defendants did not have discretionary authority sufficient to make them liable under RICO.

Fidelity argues that the Account Debtors falsely confirmed invoices to Fidelity and conspired with Micro through fund transfers to make it appear as if the invoices represented actual sales of goods. A reasonable jury could find that each of the Account Debtors was acting in response to directives from Micro, the hub of the enterprise, which was directing the enterprise's affairs. Indeed, it is a reasonable inference that the Account Debtors could not have discretionary authority in managing the enterprise's affairs because such discretion would inherently conflict with the coordination necessary to fool Fidelity. It is quite plausible for a jury to find that the Account Debtor defendants merely allowed themselves to be used by Micro as a conduit of funds in Micro's scheme and that their only actions were to confirm invoices when called by Fidelity and to sign and mail checks as required by Micro's scheme.

With regard to the deceptive nature of the funneling of money from Micro to the Account Debtors, once again a reasonable

juror could find that somebody at Micro directed the process. Indeed, the record reflects a series of transfers of $25,000 from Micro to Thrifty through checks made payable to Klein Dental but endorsed for deposit into Thrifty's account. There is nothing to suggest that these transfers were related to this enterprise, but their existence allows for the reasonable inference that Micro simply chose to continue this practice when Thrifty became part of the enterprise. Thus, the court denies Fidelity's motion for summary judgment on the RICO claim against the Account Debtors.

With regard to Reinhold and Kotlarsky, however, both of whom were Micro officers and employees, there is no genuine issue of material fact regarding whether they managed the enterprise. As described above, by its nature, the scheme required central coordination. Indeed, as Kotlarsky told Johnson in explaining the creation of shipping documents, "We covered our tracks." Johnson Aff., Exh. 77. Summary judgment is therefore granted on the RICO causes of action against Kotlarsky and Reinhold.

D. *RICO Conspiracy*

"When read in conjunction with the language of § 1962(c), RICO's conspiracy provision proscribes an agreement to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Viola,* 35 F.3d at 43 (citation omitted). Fidelity can demonstrate a RICO conspiracy against any defendant by proving that the defendant "embraced the objective of the alleged conspiracy and agreed to commit two predicate acts in furtherance thereof." *Id.* (citations omitted). Because § 1962(d) does not require that a defendant be among the class of persons who could participate in the crime directly, a defendant may be found liable for a RICO conspiracy even if he did not manage the RICO enterprise. *Id.*

As previously discussed, Fidelity has not adduced evidence demonstrating as a matter of law that either Ciporah Greenfield or Klein Dental agreed to commit the requisite two predicate acts. Neither of these defendants, therefore, can be held liable to Fidelity under § 1962(d) at this (summary judgment) stage in the proceedings. As for the other Account Debtor defendants—Masel, UTA, and Thrifty—it is clear as a matter of law that they did commit two crimes that qualify as RICO predicate acts. As in *Viola,* "[t]he narrow issue thus presented is whether the government produced sufficient evidence to convince a jury beyond a reasonable doubt that [the Account Debtor defendants] knowingly associated with the ... enterprise by agreeing to commit the predicate acts." *Viola,* 35 F.3d at 43–44.

Though, as defendant points out, *Viola* establishes that "the proof required to show that a defendant knowingly associated with an existing conspiracy 'need not be overwhelming,'" *id.* at 44 (citation omitted); Plaintiff FFOC's Mem. of Law, Fidelity nonetheless bears the burden of making a prima facie showing. That burden of course is greater at the summary judgment stage of a proceeding than when reviewing the verdict of a jury, or when considering a defendant's motion to dismiss. Plaintiff's citations to cases like *United States v. Teitler,* 802 F.2d 606, 614, reviewed in the former posture, and *Morrow v. Black,* 742 F.Supp. 1199, 1208 (E.D.N.Y.1990), arising in the latter posture, therefore, are inapposite. Additionally, neither defendants' "familial and community ties," Plaintiff FFOC's Mem. of Law, nor defendant's common Hasidic identity, *id.,* can satisfy this requirement. Upon consideration of the record, the court finds that Fidelity has not indisputably established, as a matter of law, that each remaining Account Debtor defendant, specifically, Masel, Thrifty, Herbert Greenfield, UTA and Irving and Josef Goldstein, knowingly associated with the entire RICO enterprise encompassing all of the Account Debtors, or were aware of

the scope of the enterprise, or indeed were even aware that the enterprise extended beyond each Account Debtor's individual role. Because there remain genuine issues of material fact regarding the extent to which the remaining Account Debtor defendants "embraced the objective of the alleged conspiracy," summary judgment on the RICO conspiracy claims cannot be granted against them.

In contrast to the Account Debtor defendants, the court finds sufficient evidence in the record to grant summary judgment on the RICO conspiracy claims against defendants Reinhold and Kotlarsky. As the clear architects and choreographers of the fraud scheme, Reinhold and Kotlarsky obviously had knowledge of the scope, nature, and objectives of the conspiracy. Because Micro and Maxum were at the center of the wheel, they were actively engaged in each spoke of the conspiracy. Indeed, without their orchestration, the scheme to defraud Fidelity would have been wholly impossible. There are no genuine issues of material fact remaining in regards to Reinhold and Kotlarsky's liability on the RICO conspiracy claims.

VI. *Conversion*

Fidelity has moved for summary judgment on its conversion claim against five defendants. However, at this stage in the proceedings, only one defendant, Marshall K. Shaw, remains of those named in the Complaint.

Plaintiff's claim against Shaw stems from Shaw's alleged participation in the formulation and execution of a plan to transfer property, in which plaintiff asserts a perfected security interest, from Micro/Maxum's common facility in Fairfield, New Jersey to a location in Brooklyn. The property alleged to have been converted by defendants includes Micro's and Maxum's former inventory, equipment, and books and records.

"Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Steinmetz v. Toyota Motor Credit Corp.*, 963 F.Supp. 1294, 1306 (1997) (quoting *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496 (4th Dept. 1981)).

Plaintiff asserts that Shaw's presence at a meeting on July 22, 1995 and assistance moving a cart containing computer chassis to a truck suffices to establish the conversion claim against him. Shaw answers that "[p]laintiffs had no right or legal ownership to the equipment or goods allegedly converted." Shaw points to an "Intercreditor and Subordination Agreement" negotiated on January 24, 1995 whereby, *inter alia*, Fidelity agreed to "forebear from exercising any and all rights and remedies it may now or hereafter have against the Inventory. . . ." *See* Def. Marshall K. Shaw's Memorandum of Law, Exh. A., at 5–6. Fidelity counters that this agreement regards solely the inventory of Micro, and not Maxum, and argues that even if it does subordinate Fidelity's security interest in the inventory to another creditor (AT & T), Fidelity maintains an ownership interest in the property greater than Micro's/Maxum's, and thus has a valid conversion claim. Shaw also disputes Fidelity's claim that the inventory was moved with any intent or purpose to convert the inventory or to evade Fidelity's ownership interests.

Under New York law, " '[w]here the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property.' " *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) (quoting *Johnson v. Gumer*, 94 A.D.2d 955, 464 N.Y.S.2d 318 (4th Dept. 1983)). On the record before the court, it cannot be concluded that no reasonable juror could find that possession of the property by Micro/Maxum, and Shaw's access to that property, was originally lawful.

The court finds that genuine issues of material fact remain regarding, *inter alia,* whether the property was moved by Shaw after plaintiff had made demand on the goods, or if no actual demand had been made, whether Shaw actually "intended to deprive [Fidelity] of such property and frustrate the enforcement of any judgment that [Fidelity] might have obtained against either Micro or Maxum." Compl., ¶ 202. The court also finds genuine issues of material fact regarding the precise ownership status of the goods in question at the time that the property was transferred to Brooklyn, and regarding whether defendant Shaw's actions were sufficiently substantial to impose liability for conversion under a theory of aiding and abetting conversion under New York law. The court therefore denies Fidelity's motion for summary judgment against defendant Shaw on the conversion claim.

VII. *Dishonored Checks*

Shortly after Fidelity discovered the fraud. Thrifty stopped payment on a check issued to Micro and forwarded by Micro to Fidelity. At the same time, a check written by Masel was also returned for insufficient funds. Thrifty's check was dated July 17, 1995, signed by Herbert Greenfield, and issued in the amount of $217,320. Masel's check was dated July 13, 1995, signed by Michael Mendlovic, and issued in the amount of $211,500. Both checks were made payable to Micro, and were assigned to Fidelity pursuant to ¶¶ 2.8 and 9.2 of the Purchase and Sale Agreement. *See* Haddad Aff., Exh. 3. Fidelity possesses a power of attorney authorizing it to negotiate checks made payable to Micro. *Id.* Fidelity has moved for summary judgment against Masel and Thrifty for payment on these dishonored checks. *See* Compl., Tenth Cause of Action.

Under the New York Uniform Commercial Code, a plaintiff may pursue an action to recover for a dishonored check "on either the instrument or the obligation." N.Y.U.C.C. § 3-802(1)(b) (McKinney 1991). Fidelity seeks here to recover from Masel and Thrifty on the instrument. The defendants do not dispute that the signatures on the checks are authentic and thus by law waive any argument to that effect. *See* N.Y.U.C.C. § 3-307(1).

According to § 3-307(1)(b)(2) of the New York U.C.C., "[w]hen signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense." Hence, Fidelity should prevail unless Masel and Thrifty can establish a defense supported by some evidence in the record so as to withstand plaintiff's motion for summary judgment.

Defendant Masel asserts that it "has defenses against Fidelity." *See* Certain Def.'s Mem. of Law, at 25. Masel suggests that it might wish at some later point to pursue various theories, "including the potential for offsets, the adequacy of consideration received by the account debtors, and questions concerning whether the account debtors were themselves deceived by the officers of Micro and Maxum." *See* Certain Def.'s Memo of Law, at 23–24. However, Masel fails to plead any specific defense, and has not identified any evidence in the record to support any of its speculative defenses. Because, as Fidelity points out, "the defendant has the burden of establishing any and all defenses, not only in the first instance but by a preponderance of the total evidence," N.Y.U.C.C. § 3-307, Official Comment 2 (McKinney 1991), Masel's failure to present any actual defense precludes it from averting plaintiff's summary judgment motion.

In contrast to Masel, Thrifty does make a modest gesture toward presenting a defense, pointing to a provision of the New York Uniform Commercial Code stating that: "[u]nless he has the rights of a holder in due course any person takes the instrument subject to ... the defenses of want or failure of consideration." N.Y.U.C.C. § 3-306(c) (McKinney 1991). Thrifty asserts that Fidelity is not a holder in due course, and that "Fidelity *admits*

that no consideration was given by Micro for the check." Mem. of Law by the Greenfield Defendants, at 9. From this, Thrifty concludes that it has a triable defense.

While Thrifty correctly observes that Fidelity has not argued that it is a holder in due course, New York law makes clear that "[t]he question of whether plaintiff is a holder in due course does not arise until it is shown that a defense does exist capable of being asserted against a mere holder." *Thrift Credit Corp. v. American Overseas Trading Corp.*, 54 A.D.2d 994, 387 N.Y.S.2d 930, 931 (3rd Dept., 1976); N.Y.U.C.C. § 3–307(3). Mere conclusory assertions are insufficient to allow a defendant to withstand a motion for summary judgment. Rather, "[t]he defendant is required to assemble, lay bare, and reveal his proofs in order to show that his defenses are real and capable of being established upon a trial." *Id.* at 932 (citing *Holdridge v. Town of Burlington,* 32 A.D.2d 581, 299 N.Y.S.2d 340 (3d Dept. 1969)). "In opposing plaintiff's motion for summary judgment, 'it was essential for the defendants, in claiming absence of consideration, to state their version of the facts in evidentiary form.'" *Id.* (quoting *Ehrlich v. American Moninger Greenhouse Mfg. Corp.*, 26 N.Y.2d 255, 259, 309 N.Y.S.2d 341, 257 N.E.2d 890 (1970)).

While a claim of fraud in the inducement, when supported by evidence substantiating the allegations, provides a triable defense, *see Nutmeg Financial Services, Inc., v. Cowden,* 524 F.Supp. 620, 621 (E.D.N.Y.1981) (finding no genuine issue of fact raised by defendants asserting reliance on certain fraudulent misrepresentations made by individuals in issuing promissory notes where no supporting evidence was submitted), defendants do not argue that they were the victims of such fraud. Rather, they argue that their own fraudulent representation to Fidelity (that they received consideration from Micro when, in fact, they did not), provides a legal justification for dishonoring the check submitted to Fidelity as part of the fraudulent scheme. This argument does not provide the basis for a defense that is "real and capable of being established upon a trial." Defendants' own fraud cannot shield them from otherwise binding legal obligations.

Furthermore, even if the evidence indicates that the Account Debtors never received computer merchandise from Micro, that fact in itself does not affirmatively establish a failure of consideration. As the scheme functioned, Micro reimbursed the Account Debtors on the checks paid to plaintiff. Absent any affirmative evidence from defendants that there was no consideration given for the checks, the existence of a valid defense of failure of consideration cannot be inferred from plaintiff's simple acknowledgment that the Account Debtors received no computer inventory from Micro. In short, Thrifty's plain assertion of failure of consideration, without more, does not suffice to provide a defense averting summary judgment. Summary judgment is therefore granted against Thrifty, as well as Masel, on Fidelity's dishonored check claim.

### VIII. *Breach of Guaranty Agreements*

Finally, Fidelity has moved for summary judgment against defendant Reinhold for breach of two guaranty agreements. The agreements, which were signed by Reinhold in January 1995, guaranteed "any and all indebtedness and obligations" to Fidelity that were incurred by Micro and Maxum. *See* Haddad Aff., Exhs. 4 & 5. Because defendant Reinhold has not filed any answering papers to dispute the factual statements contained in Fidelity's Rule 3(g) Statement, those facts are deemed admitted pursuant to Local Civil Rule 56.1(c) (formerly Local Civil Rule 3(g)) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").

Accordingly, the court finds as a matter of law that defendant Reinhold agreed to guaranty all indebtedness and obligations of Micro and Maxum to Fidelity, and that for the purposes of this summary judgment motion, defendant Reinhold is liable to Fidelity for the primary obligation, plus interest and all reasonable attorneys' fees and all other costs and out-of-pocket expenses incurred by Fidelity in the enforcement of its claims against defendants Micro and Maxum.

*CONCLUSION*

For the reasons described above, the court grants Fidelity's motion for partial summary judgment against defendants Reinhold and Kotlarsky on causes of action under RICO §§ 1962(c) and (d); and against defendants Reinhold, Kotlarsky, Masel, Herbert Greenfield, Thrifty, UTA, and Irving and Josef Goldstein on the fraud cause of action. The court also grants the motion against defendant Reinhold for breach of guaranty, and against Masel and Thrifty for dishonored checks. The court denies Fidelity's motion for partial summary judgment against Masel, Herbert and Cipporah Greenfield, Thrifty, Klein Dental, UTA, and Irving and Josef Goldstein on the RICO claims. The court denies the motion against Ciporah Greenfield and Klein Dental on the fraud claims. The court also denies Fidelity's motion for summary judgment against Marshall Shaw on the conversion claim.

SO ORDERED.